IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANICA MOORE,
      *Plaintiff,*

    v.

PHILADELPHIA FIGHT,
      *Defendant.*

Civil No. 23-3167

**MEMORANDUM**

**Costello, J.**                                           **June 30, 2026**

Plaintiff Danica Moore is an African-American woman.  Defendant Philadelphia FIGHT is an HIV/AIDS nonprofit serving the health and social needs of marginalized groups.  Plaintiff was employed by Defendant as a social worker for seven years.  Plaintiff alleges that Defendant discriminated and retaliated against her based on her race when it transferred her to a new role within the organization and ultimately terminated her.  She brings claims for discrimination and retaliation under Title VII.  Defendant moves for summary judgment on both claims.  For the reasons that follow, the Court will grant Defendant's motion.

I.        **BACKGROUND**

        A.      **Plaintiff's Work for Defendant**

Throughout her tenure working as a social worker for Defendant, Plaintiff served in a number of roles, including building a grant-funded women's center at one of Defendant's treatment centers (the "Lax Center"), a one-on-one group counseling program, and a grant-funded training program called "Compassion Fatigue."  ECF No. 52-1 at 2-3.  During this time, Defendant gave Plaintiff multiple promotions and raises.  *Id.* at 1-3, 15.  Defendant afforded Plaintiff significant autonomy over her work and Plaintiff was given a flexible work-from-home

schedule to accommodate her childcare needs.  *Id.* at 2, 15.  Plaintiff was primarily supervised by one of Defendant's nurse practitioners, Lizzy Schmidt, with whom she had a good working relationship.  *See id.* at 2.

However, Defendant had some concerns about Plaintiff's inconsistent attendance.  *See id.* at 3 (describing Plaintiff's "inconsistent attendance and work performance"); *id.* at 4 (explaining that Plaintiff's evaluation noted issues with her "lack of consistent availability during the hours when [her] women's program tasks occur").  Defendant also had concerns about Plaintiff's fraught relationships with some of her coworkers.  *Id.* at 6 (explaining that Plaintiff's performance evaluations noted her "challenges working with other members of [Defendant's] interdisciplinary team").

These attendance and relationship issues sometimes impacted Plaintiff's work.  For instance, on September 8, 2017, a team member reached out to Plaintiff to inform her that one of Defendant's patients needed her immediate in-person assistance.  *Id.* at 5.  Plaintiff stated that she was "not available" so other staff members at the Lax Center spoke with the patient instead, including nurse manager Julie Fort.  *Id.*  It took a long time to deescalate the patient and members of the team disagreed about the proper clinical response.  *Id.*  Fort in particular disagreed with Plaintiff's suggested approach, and Plaintiff sent messages in Defendant's electronic medical record system disagreeing with Fort's position.  *Id.*  Fort informally complained to coworkers that these messages were harassing in nature.  *Id.*  Plaintiff did not hear Fort's comments but heard about them through coworkers.  *Id.*  Plaintiff filed a grievance with Defendant's management alleging racial harassment by Fort (who is white).  *Id.*  HR investigated but did not substantiate a finding of harassment by either Plaintiff or Fort.  *Id.*  Defendant did, however, have a conversation with Fort about professionalism.  *Id.*

2

**B.      Defendant Considers New Role for Plaintiff**

Throughout 2017, Plaintiff's supervisors explored the possibility of transitioning Plaintiff into a new role.  Defendant considered this transition for a few reasons.  First, Plaintiff's supervisors felt she excelled in training.  *Id.* at 4, 6 (noting Plaintiff was "excellent at group facilitation and training, and therefore interagency work would play to Plaintiff's strengths").  At the same time, the grants for some of Plaintiff's projects were expiring so several of her job duties were going to naturally end.  *Id.* at 6 (noting lapse in funding for Compassion Fatigue project).  Defendant believed that transitioning Plaintiff into a role that played to her strengths made sense for both Plaintiff and the organization.  *Id.* at 6-7.  Second, Plaintiff's inconsistent attendance created an issue for the in-person team working at the Lax Center.  *Id.* at 6, 17 n.11.  The manager of the Lax Center programs needed more on-site support that she was not consistently getting from Plaintiff.  *Id.* at 6-7.  The manager also felt that Plaintiff's "lack of presence in the Lax Center clinic" meant that "she was less interested in the direct care work" element of her job.  *Id.* at 7.  Third, Plaintiff's managers were concerned about the tension between Plaintiff and the onsite clinical care team.  *Id.* at 6.  Plaintiff's primary supervisor, Schmidt, was experiencing personal health issues and "had less capacity to mediate" the personality conflicts between Plaintiff and other members of the care team.  *Id.*

On December 8, 2017, Defendant had a meeting to discuss this potential new role with Plaintiff.  *Id.* at 7.  Plaintiff, Schmidt, Defendant's CEO Jane Shull, and Defendant's chief human resources officer Barry Robinson were in attendance.  *See id.* at 2, 4, 7.  During this meeting, Robinson described the new role as an opportunity for Plaintiff "to expand her role in inter-agency training."  *Id.* at 7.  Shull also explained that the change was in part because Plaintiff's "relationships within the Lax Center" were "not working."  *Id.*  Plaintiff asked Shull for more

specifics about this remark, but Shull declined to provide any. *Id.* Plaintiff then "immediately began to connect the dots" and "concluded that she was being targeted due to her" September grievance against Fort after their disagreement about how to deescalate a Lax Center patient. *Id.* at 7-8. After the meeting, Plaintiff sent an email complaint to the managers in attendance explaining that she felt the new job offer indicated that she was being racially targeted and retaliated against for her dispute with Fort. *Id.*

### C.    Plaintiff and Defendant Reach Impasse About New Role

Defendant's management collectively decided that they would try to work things out with Plaintiff, including discussing the concerns raised in her email complaint. *Id.* at 8. Robinson set up another meeting with Plaintiff and Defendant's general counsel D. Deone Powell for December 20, 2017. *Id.* When the meeting began, Plaintiff claimed she was uncomfortable discussing her concerns with two men. *Id.* Powell ended the meeting after that remark. *Id.* He sent Plaintiff an email with a letter offering her the new position as a cross-agency training specialist. *Id.* The email explained that Plaintiff would have until January 5, 2018 to accept the new position or be terminated with 90 days of paid leave. *Id.*

Powell followed up with another email a couple of days later containing a detailed job description and explaining that Robinson would be Plaintiff's new supervisor. *Id.* The job description contained eight elements that overlapped with her existing duties. *Id.* The description did not include Plaintiff's prior work deescalating Lax Center patients or the Compassion Fatigue project, since the funding was lapsing. *Id.* at 8-9. The description added two new components charging Plaintiff with leading new hire training and potential clinic workshops. *Id.* Plaintiff would receive the same pay and keep her same office in the Lax Center. *Id.* at 9. Plaintiff accepted the job via email on January 5, 2018. *Id.*

On January 17, 2018, Robinson tried to meet with Plaintiff to discuss the contours of the new position, but she was not in the office.  ECF No. 52-4 ¶ 419; ECF No. 56 ¶ 419.  Robinson set up another meeting for the next day.  ECF No. 52-4 ¶ 419.  Robinson viewed this as a "transitional meeting" to "talk about the job and clarify and make sure that these elements are moving over from what [Plaintiff] did in [her] former role."  ECF No. 52-4 ¶¶ 419-22 (quoting ECF No. 52-8 at 37:13-21).  Robinson felt like they never got to meaningfully discuss that topic because Plaintiff was too focused on Shull's remarks about the relationships in the Lax Center.  *Id.* ¶¶ 424-29.  Robinson believed Plaintiff's focus on this "derailed" the meeting and felt that they were at "an impasse."  *Id.* ¶¶ 430-32 (citing ECF No. 52-8 at 44:9-10).  Plaintiff denies Robinson's characterization of this meeting.  *See* ECF No. 56 ¶¶ 425-32.  She contends that she was simply seeking clarification about whether her job would involve duties in the Lax Center and Robinson did not provide her with any direction.  *Id.*

On January 24, 2018, Robinson emailed Plaintiff to set up a follow-up meeting to continue their discussion of the new role.  ECF No. 52-4 ¶ 440.  Plaintiff did not respond to Robinson's email until January 31, at which point she told him she'd been out sick.  *Id.* ¶¶ 446-47.  Robinson believed that Plaintiff's non-responsiveness and refusal to engage in productive discussions about the new position did not align with her purported acceptance of the role.  ECF No. 52-1 at 9-10; *see also* ECF No. 52-8 at 34:9-15 (Robinson testifying that Plaintiff accepted "a position that she was supposed to report to me in word only, yet her actions [did not] align with that acceptance").  Robinson, Powell, and Shull collectively decided to terminate Plaintiff's employment.  ECF No. 52-1 at 10.  Plaintiff's old position was filled a few months later by an existing African-American employee.  *Id.*

5

### D.      Plaintiff's Claims and Defendant's Motion

After filing an EEOC charge, Plaintiff brought this action alleging racial discrimination and retaliation under Title VII and the Philadelphia Fair Practices Ordinance.  *See generally* ECF No. 1.  Plaintiff alleges that Defendant discriminated against her on the basis of race when it offered her a new position and then ultimately terminated her employment.  *See generally id.* Plaintiff alleges that Defendant retaliated against her after she submitted two grievances to Defendant's management and HR:  first, the grievance for what she perceived to be racial discrimination by Fort after their disagreement about patient treatment in September of 2017; and second, the grievance for what she perceived to be racial discrimination and retaliation by her managers at the meeting where they presented Plaintiff with the new job opportunity in December of 2017.  *See id.*

Defendant moved for summary judgment on both claims.  *See generally* ECF No. 52. Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination claim because there is no record evidence supporting an inference of racial discrimination.  *See* ECF No. 52-1 at 12-17.  Defendant further argues that, even if Plaintiff could establish her prima facie case, her claim would fail because she cannot demonstrate that Defendant's reasons for her transfer and termination were pretextual.  *Id.* at 17-18.  Defendant argues that it is entitled to summary judgment on Plaintiff's retaliation claim because there is no reasonable basis for Plaintiff's belief that her two grievances constituted protected activity.  *Id.* at 19-21.  Defendant also argues that Plaintiff cannot establish that her transition to a new role was an adverse employment action because she had extremely similar responsibilities, pay, and benefits.  *Id.* at 22-23.  Finally, Defendant argues that Plaintiff's retaliation claim fails because she cannot establish a causal connection between her complaints and termination.  *Id.* at 23-25.

Plaintiff opposed the motion. *See generally* ECF No. 55. Plaintiff argues that there is record evidence supporting an inference of discrimination sufficient to defeat summary judgment. *See* ECF No. 55-1 at 9-10. Namely, she contends that Defendant treated white employees more favorably than Plaintiff regarding disputes with coworkers and attendance expectations. *Id.* at 10. She also points to evidence that she argues demonstrates a pattern of discrimination by Defendant against African-American employees. *Id.* at 9-10. Plaintiff also argues that her retaliation claim should survive summary judgment. *See generally id.* She contends that the jury could reasonably find that both of Plaintiff's grievances constituted protected conduct, *id.* at 4-5, that there is a sufficiently close temporal nexus between her grievances and termination, *id.* at 6-7, and that there are weaknesses and inconsistencies in Defendant's purported reasons for her termination sufficient to establish pretext, *id.* at 7-9.

## II.    LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine." *Bennett v. SEPTA*, 23cv1271, 2024 WL 404959, at *6 (E.D. Pa. Feb. 2, 2024), *aff'd sub nom.*, *Bennett v. Se. Pa. Transp. Auth.*, 24cv1376, 2025 WL 1248815 (3d Cir. Apr. 30, 2025). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if, "based on the evidence, 'a reasonable jury could return a verdict for the nonmoving party.'" *Bennett*, 2024 WL 404959, at *6 (quoting *Anderson*, 477 U.S. at 248).

The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). "When the

7

movant is the defendant, they have the burden of demonstrating that the plaintiff 'has failed to establish one or more essential elements of her case.'" *Bennett*, 2024 WL 404959, at *6 (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013)). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "If Plaintiff fails to raise a genuine dispute of material fact as to any element of his prima facie case, summary judgment in favor of Defendant is warranted." *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 433 (E.D. Pa. 2023) (citing *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996)).

The Court does not weigh evidence or make credibility determinations at the summary judgment stage. Rather, it simply determines "whether there is a genuine issue for trial." *Bennett*, 2024 WL 404959, at *6 (citing *Anderson*, 477 U.S. at 249). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to create a triable issue; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III.     DISCUSSION

### A.     Plaintiff's Discrimination Claim

Title VII prohibits an employer from discriminating against any individual with respect to her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In cases involving indirect proof of discrimination under Title VII, a plaintiff must establish a prima facie case by showing that (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an "inference of intentional discrimination."

8

*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).  Only the fourth element is in dispute here.

*See* ECF No. 52-1 at 12-17 (Defendant arguing that there is a lack of record evidence supporting

an inference of discrimination); ECF No. 55-1 at 9-10 (Plaintiff addressing the same).

### 1.      Inference of Intentional Discrimination

A plaintiff can raise an inference of discrimination "'in a number of ways, including, but

not limited to, comparator evidence,' or evidence of similar . . . discrimination towards other

employees." *Onely v. Redner's Markets, Inc.*, 697 F. Supp. 3d 410, 422 (E.D. Pa. 2023) (citing

*Selvato v. SEPTA*, 143 F. Supp. 3d 257, 268 (E.D. Pa. 2015)) (quoting *Golod v. Bank of Am.*

*Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010)).

Plaintiff challenges her termination as being motivated by unlawful racial

discrimination.[1]  She points to the following evidence as supportive of an inference of

discrimination: (1) Plaintiff's testimony that "she personally witnessed that Black and Brown

employees were being forced out of the job"; (2) Plaintiff's testimony that other African-

American employees were fired by Defendant; (3) evidence that Defendant treated white

employees more favorably than Plaintiff; (4) race discrimination complaints lodged against

Defendant by five other employees; and (5) the Pennsylvania Human Relations Commission's

report on Plaintiff's race discrimination complaint.  ECF No. 55-1 at 9-10.  Taking each in turn,

none supports an inference of discrimination sufficient to establish Plaintiff's prima facie case.

*First*, Plaintiff testified that Defendant had a "pattern of targeting black women," that "no

black person . . . had been there long-term," and that she "knew at some point [that she] would

---

[1] Plaintiff seemingly only relies on her termination as the basis for her discrimination claim—not the decision to transfer her.  *See* ECF No. 55-1 at 9-10 (arguing that Plaintiff was qualified to perform her job and "subjected to adverse actions when Defendant fire[d] her").  The Court's analysis will accordingly focus on that employment decision.

be forced out." ECF No. 52-6 at 72:12-22. Plaintiff's testimony that Defendant had a "pattern" of targeting African-American women is a mere legal conclusion. "In the context of employment discrimination claims, 'conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment.'" *LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 676 (E.D. Pa. 2016) (quoting *Taylor v. Cherry Hill Bd. of Educ.*, 85 F. App'x 836, 839 (3d Cir. 2004)).

Plaintiff's testimony that she "knew" she would be "forced out" because "no black person" had been employed by Defendant long-term is inherently speculative. "[A]n inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat an entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990); *see also Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 610 (E.D. Pa. 2014) (granting summary judgment because "Plaintiff has simply not put forth any evidence, beyond mere speculation" of racial discrimination by employer). This evidence accordingly does not support an inference of intentional discrimination.

*Second*, Plaintiff testified that other African-American and non-white employees were "forced out," including LaQuinta Washington, Dannette Burry, Devra Stroud-Banks, Shani Robin, Luis Berrios, and Vivianna Ortiz. ECF No. 58-1 ¶ 12 & n.2. However, Plaintiff admitted in her deposition that she has no "independent knowledge" of the circumstances surrounding the departure of those employees. ECF No. 52-6 at 73:3-75:11. Plaintiff testified that she was only aware of the departures because someone in HR told her. *Id.*; *see also id.* at 194:9-21 (Plaintiff testifying that she "sat down with [HR representative] in 2016 and she . . . made a list of every single person that had been fired by [Defendant] and all of them were black . . . Since I've been

here, only black people have been fired. And what I've heard from people who have been here longer, it's always only been black people.").

Without any firsthand knowledge of the circumstances surrounding these departures, Plaintiff's testimony—particularly her characterization of these individuals as "forced out" due to their race—is also inherently speculative. *See Robertson*, 914 F.2d at 382 n.12; *Kier*, 72 F. Supp. 3d at 610. This evidence does not support an inference of discrimination sufficient to defeat summary judgment.

*Third*, Plaintiff argues that there is evidence that Defendant treated two white employees more favorably than Plaintiff. ECF No. 55-1 at 10. When relying on comparator evidence, a plaintiff must show that the proffered comparator is "similarly situated"—*i.e.*, is not a member of the same protected class and was "treated more favorably under similar circumstances." *LaRochelle*, 210 F. Supp. 3d at 692-93.

To determine whether employees are similarly situated, courts consider a variety of factors, including whether the employees dealt with the same supervisor, were subject to the same standards, shared similar job responsibilities, and the nature of the alleged misconduct. *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014); *see also Fennell v. Comcast Cable Commc'ns Mgmt., LLC*, 628 F. Supp. 3d 554, 573 (E.D. Pa. 2022) (also considering salary and any "other factors relevant to the particular workplace") (internal quotations omitted). "A similarly situated employee does not need to be identically situated, but the comparator must be similar to plaintiff in 'all relevant aspects.'" *Abdul-Latif*, 990 F. Supp. 2d at 525 (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881-82 (3d Cir. 2011)). "Whether two individuals are similarly situated is generally a fact question for a jury to decide." *Onely*, 697 F. Supp. 3d at 422 (internal quotations omitted). "Nonetheless, summary judgment is

11

appropriate where there is no evidence from which a jury could conclude the parties were similarly situated." *Abdul-Latif*, 990 F. Supp. 2d at 526.

First, Plaintiff contends that Defendant treated nurse manager Fort, who is white, more favorably because she "acted inappropriately toward Plaintiff" but "Plaintiff was required to transfer, not Fort." ECF No. 55-1 at 10.[2] While Defendant admits that it determined Fort acted unprofessionally toward Plaintiff, *see* ECF No. 58-1 at 24, Plaintiff does not point to any evidence that Fort is similarly situated to her. That alone justifies concluding that Fort is not a relevant comparator. For instance, in *Fennell v. Comcast Cable Communications Management, LLC*, the plaintiff proffered several coworkers as comparators to support his discrimination claim. 628 F. Supp. 3d at 574-79. The court found that the plaintiff failed to provide "any record support for his contentions" that he shared job responsibilities with the comparators, and pointed to "no facts, in his Counterstatement of Facts or otherwise, to support even an inference that these three individuals have relevant job similarities to qualify as comparators[.]" *Id.* at 577. The court repeatedly emphasized that it was plaintiff's burden to establish that the proffered comparators were "similar in all relevant, or material, respects." *Id.* at 578. "Without pointing to evidence as to the nature of these determinations, [plaintiff] has not met this burden[.]" *Id.*

Although Plaintiff has not satisfied her burden, the Court notes that there are obvious, relevant dissimilarities between Plaintiff and Fort that weigh against considering them to be "similarly situated." Namely, there is no evidence that Fort had any record of inconsistent attendance issues. *See generally* ECF No. 56 (Plaintiff's SUMF, which does not contain any evidence that Fort worked from home or failed to show up to the Lax Center when she was

---

[2] This posture is somewhat strange, since Plaintiff otherwise frames her discrimination claim as challenging only her termination—not her transfer. *See supra* at n.1.

required to work in person).  This is a "relevant" point of comparison, considering Plaintiff's

attendance issues were part of Defendant's decision to transfer and terminate her.  *See supra* at 3,

5.  This weighs against a finding that Fort and Plaintiff are similarly situated.  *See Doe v. Apria*

*Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015) (considering whether plaintiff and

comparator employee had "essentially comparable violation histories" and explaining that

"critically, the plaintiff's conduct that drew the adverse employment decision must have been

'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment

decisions"); *see also Medina v. Menasha Packaging Co.*, 23cv4956, 2024 WL 4437635, at *6

(E.D. Pa. Oct. 7, 2024) ("[A] Title VII comparator must have engaged in acts of 'comparable

seriousness' without any 'differentiating or mitigating circumstances' that makes their conduct

less severe.'") (quoting *Anderson v. Haverford Coll.*, 868 F. Supp. 741, 745 (E.D. Pa. 1994)).[3]

Second, Plaintiff contends that Mimi McNichol, a white employee, worked from home

and "would disappear for weeks and even months at a time and not tell anyone where she was,

and she was not fired."  ECF No. 55-1 at 10; *see also* ECF No. 52-6 at 54:14-56:22.  However,

Plaintiff testified that this information is based on "office gossip."  ECF No. 52-6 at 57:10-14.

This type of unfounded conjecture cannot create a triable issue.  *See Robertson*, 914 F.2d at 382

n.12.  Moreover, Defendant submitted uncontroverted evidence that McNichol's absences were

known about and approved by Defendant.  *See* ECF No. 58-1 ¶ 101 (citing to sworn affidavit

submitted by McNichol, ECF No. 52-12 ¶¶ 49-52).

---

[3]  Even if Plaintiff and Fort were similarly situated, it is not clear to the Court that Fort was
treated "more favorably."  *LaRochelle*, 210 F. Supp. 3d at 693.  Plaintiff was transferred to a new
job position that was substantially similar to her prior position and better played to her strengths.
*See supra* at 3.  Fort was the subject of an HR investigation and given a talking to about being
more professional towards her colleagues.  *See* ECF No. 52-1 at 5.  Plaintiff fails to explain how
her being offered a new position was less favorable treatment than Defendant's response to Fort.
*See* ECF No. 55-1 at 10.

Regardless, Plaintiff has not set forth any evidence that McNichol was similarly situated to her. When asked about McNichol's role in her deposition, Plaintiff said that it changed, but that she thinks she largely "helped out with case management." ECF No. 52-6 at 56:23-57:7. This tells the Court nothing about McNichol's job duties, level of supervisory responsibilities, salary, or anything else that would help the Court analyze whether she shares relevant similarities with Plaintiff.[4] *See Fennell*, 628 F. Supp. 3d at 573 (setting forth factors in considering whether a proffered comparator is "similarly situated"). Plaintiff has therefore failed to satisfy her burden of demonstrating that McNichols is an appropriate comparator. *See id.* at 578 (it is a plaintiff's burden to show record evidence of relevant similarities).

*Fourth*, Plaintiff cites to formal and informal complaints about race discrimination by Defendant lodged by former employees. ECF No. 55-1 at 10; ECF No. 55 ¶¶ 105-14 (describing complaints by Dr. Mario Cruz, Carla Coleman, Karin Scheible, Morris Burns, and Elisabeth Long). Defendant objects to the Court's consideration of these complaints as inadmissible hearsay and propensity evidence. *See* ECF No. 58-1 ¶¶ 105-14. At summary judgment, a court "may consider evidence that is not admissible in the submitted form if the party offering the evidence could satisfy the applicable admissibility requirements at trial." *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004). Plaintiff has failed to address whether these various complaints could be offered in an admissible form at trial.[5]

---

[4] At oral argument on this motion, the Court asked Plaintiff if she could provide any more details showing that any of her proffered comparators were similarly situated. Plaintiff failed to provide any such details, arguing only that comparators do not have to share the exact same job responsibilities. *See* ECF No. 67 at 15:9-16:18.

[5] It is Plaintiff's burden to show the proffered evidence is admissible. *See Bouriez v. Carnegie Mellon Univ.*, 02cv2104, 2005 WL 2106582, at *2 (W.D. Pa. Aug. 26, 2005) ("It is clear that the party offering the evidence must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment.").

Regardless of these evidentiary objections, it is unclear how the various complaints are relevant to Plaintiff's claims. Plaintiff can use evidence of "*similar . . .* discrimination of other employees" to raise an inference of discrimination. *Golod*, 403 F. App'x at 702 n.2 (emphasis added). Plaintiff makes no attempt to explain how these informal and formal complaints of general race discrimination by Defendant bear any similarities to the discrimination she alleges. For instance, Plaintiff relies on an informal letter complaint by former employee Dr. Cruz. In the letter, Dr. Cruz alleges he "was discriminated against because he is a Black male" and describes "many allegations of racism made against [Defendant's CEO] by current and former employees." ECF No. 55 ¶¶ 106-07. Plaintiff cannot explain how these conclusory allegations support an inference that *her* termination was motivated by racial discrimination. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (in employment discrimination cases, "the question of whether evidence of discrimination against other employees by other supervisors is relevant is fact based and depends on several factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case").

At oral argument, Plaintiff also pointed to her testimony that she had to "mediate" complaints from other African-American employees about racial discrimination by Fort, but never had to mediate issues between Fort and her white coworkers. *See* ECF No. 67 at 84:7-21. But there is no evidence in the record detailing the circumstances giving rise to these purported "mediations" to suggest they had anything to do with race beyond Plaintiff's own speculation. *See* ECF No. 55 ¶¶ 29-30 (citing to Plaintiff's own testimony to support this contention).

At bottom, Plaintiff cannot explain how these vague allegations of discrimination made by former employees are similar or relevant to the discrimination alleged by Plaintiff herself. These reports therefore cannot support an inference of intentional discrimination by Defendant.

*Fifth*, and finally, Plaintiff points to the PHRC report detailing the investigation into her complaint of race discrimination by Defendant.  ECF No. 55-1 at 10.  The report found that it is "more likely than not" that Defendant was offered the new position and ultimately terminated because of her race.  *See* ECF No. 55-12 at 6.  Defendant objects to the Court's consideration of this report on summary judgment, arguing that it is inadmissible under Federal Rule of Evidence 403.  ECF No. 58-1 ¶ 90 (arguing that the introduction of the report is substantially more prejudicial than probative of the issues in this case).

The Court agrees with Defendant.  The types of administrative findings contained in PHRC reports merely "summarize[] the parties' allegations," do not contain a comprehensive description of the entire investigative process, and "culminat[e] in a conclusory finding of probable cause."  *Waters v. Pennsylvania Hum. Rels. Comm'n*, 13cv2652, 2017 WL 24670, at *3 (M.D. Pa. Jan. 3, 2017) (citing *Berry v. Georgetown Inn., Ltd.*, 08cv0205, 2010 WL 608076, at *2 (W.D. Pa. Feb. 18, 2010)).  It would be highly prejudicial to permit the jury to hear those legal conclusions on the ultimate issues in this case—*i.e.*, whether Plaintiff's termination was motivated by discrimination.  The jury may give undue weight to the agency's findings and accordingly abdicate its role as the fact finder.  *See Cambra v. Rest. Sch.*, 04cv2688, 2005 WL 2886220, at *4 (E.D. Pa. Nov. 2, 2005) ("this case will be tried before a jury that may give undue weight to a letter written by a government agency").  Moreover, the reports are largely cumulative because the information will "repeat[] many of the facts that both parties will attempt to prove at trial."  *Id*.  Thus, the Court will not consider this evidence at summary judgment because it could not be offered in an admissible form at trial.

16

2.      *McDonnell Douglas* Burden-Shifting Framework

Even if Plaintiff could establish her prima facie case, her discrimination claim would fail at the next two steps of the *McDonnell Doulgas* burden-shifting framework.  If a plaintiff makes a prima facie showing of discrimination, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the defendant articulates such a reason, then the plaintiff must "establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action."  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).  The plaintiff can make this showing by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"  *Cagnetti v. Juniper Vill. at Bensalem Operations*, 18cv5121, 2020 WL 4039027, at *6 (E.D. Pa. July 17, 2020) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)).

1.      *Defendant's Legitimate, Non-Discriminatory Reasons for Plaintiff's Termination*

Defendant proffers three legitimate, non-discriminatory reasons for Plaintiff's termination.  First, Defendant presented uncontroverted evidence that Plaintiff only attended work three days in all of January of 2018.  ECF No. 52-4 ¶ 438.  Those attendance issues were evidenced by Robinson's attempt to meet with Plaintiff on January 17, but she was not in her office.  *Id.* ¶ 419.

Second, Plaintiff was not responding to Robinson, who was her new supervisor.  Robinson testified that he felt that Plaintiff's failure to respond to his email to discuss the contours of her new role for several days, and failure to tell Robinson that she was on sick leave,

17

did not align with her purported acceptance of that new job.  *Id.* ¶ 451 (quoting ECF No. 52-8 at 34:9-15) (testifying that Plaintiff was fired in part for "accepting a position that she was supposed to report to me in word only, yet her actions didn't align with that acceptance.").  Shull also testified that she was aware that Robinson felt that Plaintiff was not cooperating with him as her supervisor.  *Id.* ¶ 454 (citing ECF No. 52-10 at 31:15-21).

Third, Robinson believed that Plaintiff was unwilling to meaningfully discuss the parameters of her new job responsibilities with him.  Robinson felt like they never got to discuss that topic because during their meeting about the new position, Plaintiff was too focused on Shull's remarks about the relationships in the Lax Center.  *Id.* ¶¶ 424-29.  Robinson believed Plaintiff's focus on this "derailed" the meeting and felt that they were at "an impasse."  *Id.* ¶¶ 430-32; *see also* ECF No. 52-8 at 37:6-21, 44:9-45:1.  Defendant's COO, Barbara Bungy, echoed this sentiment.  ECF No. 52-4 ¶ 457 (citing ECF No. 52-7 at 46:9-17) (Bungy testifying that it was her opinion that Plaintiff never meaningfully accepted the new position because "she never met with [Robinson] to get the logistics of the new position and begin").

### 2.    *Establishing Pretext*

Plaintiff argues that Defendant's purported reasons for terminating her are pretextual because they are inconsistent.  ECF No. 55-1 at 8-9.  Plaintiff does not point to any evidence to show that her attendance issues were not part of Defendant's actual motivation in terminating her.  *See id.* (addressing only her sick leave and communication with her supervisors).[6]  Nor does

---

[6]  Rather than showing evidence casting doubt on this proffered reason for her termination on the merits, at oral argument on this motion, Plaintiff disputed the admissibility of Defendant's attendance records.  *See* ECF No. 67 at 43:24-44:9 (arguing these records are hearsay).  This argument is unavailing, as these timesheets likely qualify for the hearsay exception for business records "kept in the course of a regularly conducted activity."  Fed. R. Evid. 803(6)(B); *see also* ECF No. 67 at 44:10-45:3.

she address Defendant's position that Plaintiff and Robinson were not able to have a meaningful conversation about the contours of her new role because Plaintiff kept "derailing" it by bringing up Shull's remarks about her relationships with others in the Lax Center. *See* ECF No. 55-1 at 8 (stating only that she met with Robinson on January 18). This alone warrants concluding that Plaintiff did not meet her burden to establish pretext. *See Fuentes*, 32 F.3d at 762 ("the plaintiff generally must submit evidence which . . . casts sufficient doubt upon *each* of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that *each* reason was a fabrication") (emphasis added); *see also Zahir v. Donahoe*, 11cv5080, 2012 WL 6591824, at *7 (E.D. Pa. Dec. 17, 2012) (finding plaintiff failed burden at third step of *McDonnell Douglas* framework where he did not address each of the proffered grounds for his termination).

With respect to Defendant's position that Plaintiff was not communicating with Robinson, her new supervisor, Plaintiff points to a few pieces of evidence that she suggests show inconsistencies. First, while Plaintiff was out sick, Robinson did not reach out to her to ask where she was. ECF No. 55-1 at 8. Second, when she returned, she let Robinson know she was back, and he responded with well wishes. *Id; see also* ECF No. 58-1 ¶ 83 (showing these facts are undisputed). Plaintiff argues that "[i]f Robinson was so upset that Plaintiff called out [sick] and told Schmidt and not him, one would imagine Robinson would have said something about that in his email or said something during the termination meeting[.]" ECF No. 55-1 at 8.

This argument is unavailing. Plaintiff is asking the Court to speculate from inaction that Robinson did not actually care about Plaintiff's failure to communicate. This does not amount to "contradictory" evidence from which a jury could disbelieve this legitimate reason proffered by Defendant. *See Fuentes*, 32 F.3d at 765. Nor does it amount to evidence that Robinson did not

19

actually rely on his perceived issues with Plaintiff's communication (or lack thereof) when making the termination decision.  "[W]hat matters for the purpose of assessing whether [a plaintiff's] termination was discriminatory is what was in the mind of the decision-maker." *Rivera v. Off. of Att'y Gen.*, 23cv454, 2024 WL 4771388, at *12 (E.D. Pa. Nov. 13, 2024), *aff'd,* No. 24-3319, 2026 WL 74501 (3d Cir. Jan. 9, 2026).  As the Third Circuit has explained, "the question is whether [the decisionmaker] believed" the proffered reasons for Plaintiff's termination "and actually relied upon them, since only if [Plaintiff] can ultimately prove that [the decisionmaker] in fact did not rely upon them can [Plaintiff] show 'pretext.'" *Fuentes*, 32 F.3d at 766-67.  The fact that Robinson did not scold Plaintiff immediately upon her return from sick leave is not probative of his state of mind.  It does not show that he did not actually take issue with her initial failure to communicate with him about her sick leave.

Finally, Plaintiff argues that she was told at different times that different people made the decision to terminate her.  *See* ECF No. 55-1 at 8-9 (arguing that Robinson said he was not the person who fired Plaintiff, and that Bungy said that Shull made the decision to fire Plaintiff).  Defendant admits that Robinson and Bungy made those remarks but argues that does not negate the undisputed fact that Robinson, Powell, and Bungy were all involved in the termination decision, and Plaintiff lacks the personal knowledge to deny this because she was not there when the decision was made.  *See* ECF No. 58-1 ¶¶ 86-87

It is unclear how these remarks are probative of pretext.  There must be "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's *proffered legitimate reasons* for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Fuentes*, 32 F.3d at 765 (emphasis added).  None of these remarks show inconsistencies in the actual reasons proffered for Plaintiff's termination.  At worst, the decision-

makers were not being upfront with Plaintiff about their own involvement in that decision—but not the *reasons* for that decision.

At bottom, there is simply no admissible record evidence that Plaintiff's termination was motivated by discrimination beyond Plaintiff's own conclusory speculation.  Nor is there any record evidence that Defendant's legitimate, nondiscriminatory reasons for her termination were pretextual.  A reasonable factfinder therefore could not find for Plaintiff on her discrimination claim.  Defendant is entitled to summary judgment on this claim.  *See Anderson*, 477 U.S. at 252

### B.    Plaintiff's Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show that (1) she was engaged in protected activity; (2) she was subject to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action.  *Sarullo*, 352 F.3d at 800.  To satisfy the "protected activity" requirement, a plaintiff "need not prove the merits of the underlying discrimination complaint," but she must have "act[ed] under a good faith, reasonable belief that a violation existed" when she reported it.  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).  That belief must be "objectively reasonable." *Id.* at 193-94 (quoting *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008)).

Plaintiff bases her retaliation claim on two grievances that she argues constitute protected activity under Title VII.  First, she relies on her September 2017 complaint for what she perceived to be racial discrimination by Fort after her disagreement with Plaintiff about how to deescalate a patient.  *See* ECF No. 52-4 ¶ 279.[7]  Plaintiff sent messages in Defendant's electronic

---

[7] Plaintiff raises a hearsay objection to Defendant's reliance on her written complaint but does not deny the underlying factual material. *See* ECF No. 56 ¶ 279.  The subject matter of the complaint could be testified to at trial by Plaintiff or any representative of Defendant who received or reviewed the complaint.  It is therefore appropriate to consider on summary judgment.  *See Robinson*, 326 F. Supp. 2d at 645.

21

medical record system expressing her suggestions for handling this patient.  *Id.* ¶¶ 258-64.  Fort then made remarks to other coworkers about Plaintiff saying she was harassing her.  *Id.* ¶¶ 266-67.[8]  Plaintiff did not hear Fort's comments directly but was told about them through coworkers. *Id.* ¶ 275; *see also* ECF No. 56 ¶ 275 (admitting that Plaintiff only heard about Fort's remarks through coworkers).

There is scant record evidence that Fort's remarks about this clinical disagreement had anything to do with race.  At best, the record shows that Fort's outburst and complaints about Plaintiff were "unprofessional."  ECF No. 52-4 ¶¶ 312-13 (Defendant investigated Plaintiff's allegations and found no discrimination, but Defendant had a conversation with Fort about professionalism).  Courts have held that "'personality conflicts at work that generate antipathy' and 'snubbing' . . . are not actionable" under Title VII.  *Burlington N. & Santa Fe Ry.*, 548 U.S. 53, 68 (2006).

The only evidence Plaintiff relies on to show that her belief she was reporting unlawful conduct was reasonable is her own testimony that she was asked to mediate prior complaints about Fort lodged by two other African-American employees, who thought Fort was "being racist."  *See* ECF No. 58-1 ¶¶ 31-32 (Defendant admitting this fact).  However, there is no record evidence linking these purported "mediations" to any racial discrimination by Fort.  There is no indication that Fort mentioned race, used any racially insensitive language, or made any other indications that her outburst was related to Plaintiff's race.  *See* ECF No. 52-4 ¶¶ 264, 266-67.

In other words, Plaintiff has asserted no facts "identifying specific behavior" by Fort "that would qualify as unlawful activity."  *See Gress v. Temple Univ. Health Sys.*, 784 F. App'x

---

[8]  Again, Plaintiff raises hearsay objections but does not deny the underlying factual material. *See* ECF No. 56 ¶¶ 266-67.  There were witnesses who observed these remarks by Fort, so the Court is satisfied that they would be admissible in some form at trial.

22

100, 106 (3d Cir. 2019).  "General complaints of unfair treatment" unconnected to race, color, or national origin do not constitute unlawful discrimination under Title VII.  *Davis v. City of Newark*, 417 F. App'x 201, 203 (3d Cir. 2011) (per curiam); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).  Plaintiff's allegation that Fort's remarks constituted racial harassment is therefore based on nothing more than her own conclusions and speculation.  *See Gress*, 784 F. App'x at 106 (affirming grant of summary judgment on retaliation claim where plaintiff "never put forth evidence of an illegal employment practice" beyond her own conclusory assertion that the person plaintiff complained about demonstrated "racist actions" and "invidious discrimination").

Indeed, there is undisputed record evidence that other individuals who witnessed this incident and made contemporaneous reports about it never reported any mention of race.  *See* ECF No. 52-4 ¶¶ 268-73 (explaining that Burry witnessed the incident and her reports "did not mention any racial comments made by Ms. Fort or anyone else that afternoon"); ECF No. 56 ¶¶ 268-73 (raising hearsay objections to this evidence but not disputing underlying facts).[9]  Absent any indication Fort's remarks contained references to race or were suggestive of racial discrimination, no factfinder could conclude that Plaintiff's belief she was reporting unlawful conduct was "objectively reasonable."  *See Daniels*, 776 F.3d at 193.  Accordingly, this complaint cannot serve as the basis for her retaliation claim.

Second, Plaintiff relies on her December 2017 complaint that the meeting with her managers presenting the new training-focused job opportunity constituted retaliation for her first

---

[9]  The Court is satisfied that these records would be admissible via testimony by Burry, Fort, or any other witness to the incident that day, and accordingly may be considered at summary judgment despite Plaintiff's hearsay objections to the admission of the actual emails.  *See Robinson*, 326 F. Supp. 2d at 645.

complaint about Fort. *See* ECF No. 55-1 at 5. This complaint does not constitute protected activity for two reasons. First, it is based on Plaintiff's belief that her September 2017 complaint about Fort constituted protected activity, which as explained above, *supra* at 21-23, lacks any foundation in the record. Second, Plaintiff's assertion that the new job opportunity was retaliation for the prior complaint is based on nothing but her own speculation.[10] Plaintiff points to her own complaint, which states, in a conclusory fashion, that she "immediately began to connect the dots and realized that what I was witnessing in the meeting was racial targeting and discrimination, collusion and retaliation based on the grievance that I lodged against Julie Fort[.]" ECF No. 52-20 at 71. Plaintiff's inference is based completely on conjecture and "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson*, 914 F.2d at 382 n.12. Accordingly, no factfinder could conclude that Plaintiff's belief she was reporting unlawful conduct was "objectively reasonable." *See Daniels*, 776 F.3d at 193. This second complaint also cannot serve as the basis for Plaintiff's retaliation claim.

Because Plaintiff fails to cite sufficient evidence to support the first element of her prima facie case of retaliation, the Court need not reach the remaining elements and will grant summary judgment in favor of Defendant on this claim. *See Celotex*, 447 U.S. at 323-24 ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and warrants grant of summary judgment on that claim).

---

[10] At oral argument, Plaintiff represented that Shull said during the meeting that her transfer was because of her complaint against Fort. *See* ECF No. 67 at 68:5-14. That representation is completely belied by the record. *See* ECF No. 52-4 ¶¶ 377 (showing that Shull remarked that "the relationships within the Lax Center . . . they're not working" but making no specific reference to Fort or Plaintiff's complaint about their clinical dispute).

## IV.    CONCLUSION

There is insufficient record evidence to show that Plaintiff's termination was motivated by race.  There is also insufficient record evidence to support Plaintiff's belief that she reported unlawful racial discrimination and was terminated in retaliation for those grievances.  The Court accordingly grants summary judgment in favor of Defendant on both claims.  An appropriate Order will follow.

BY THE COURT:

MARY KAY COSTELLO
United States District Judge